# 08 CV 02165

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| KAPPLER, INC.; KAPPLER CANADA; And KAPPLER LTD., On Behalf Of Themselves And All Others Similarly Situated, | |
| Plaintiffs, | Civil Action No. _____ |
| vs. | **CLASS ACTION COMPLAINT** |
| WILLIAM PRYM GMBH & CO., KG; PRYM CONSUMER USA, INC.; PRYM FASHION, INC.; COATS PLC; COATS NORTH AMERICA DE REPUBLICA DOMINICANA, INC.; YKK CORPORATION; YKK CORPORATION OF AMERICA, INC.; YKK (U.S.A.) INC.; YKK SNAP FASTENERS AMERICA, INC.; And SCOVILL FASTENERS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs bring this action for damages for price-fixing and market and customer allocation under Section 1 of the Sherman Act of 1890, 15 U.S.C. §1, the antitrust laws of the United States, and the competition laws of the European Union, against the manufacturers of certain hard haberdashery products named above. Defendants are alleged to have participated in an international conspiracy and cartel in worldwide markets for certain hard haberdashery products beginning on or about January 1, 1977 and continuing until on or about December 31, 2004. Plaintiffs, by and through their undersigned counsel, individually and on behalf of the Classes described below, complain and allege upon information and belief, except as to those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows:

## DEFINITIONS

1.     "Hard Haberdashery Products" means fasteners, zippers (also known as "zips"), snaps, hooks & eyes, rivets, eyelets and similar fastening devices (excluding pins and needles) that affix two or more objects together, and their attaching machines.

2.     "Cartel" means the combination of Defendants named herein and their co-conspirators that conspired to fix, raise, maintain, or stabilize the prices of Hard Haberdashery Products.

3.     "Class Period" refers to the period from January 1, 1977 through and including December 31, 2004.

4.     "E.U." means the European Union.

1

5.    "EC Treaty" means Article 81 of the Treaty on European Union and Consolidated Version of the Treaty Establishing the European Community, Maastricht, Rome, and Amsterdam, 7 February 1992, 25 March 1957, 2 October, 1996 (36 I.L.M. 56(1998)).

6.    "EFTA/EEA State" means Norway, Iceland, and/or Liechtenstein.

7.    "EEA Agreement" means Article 53 of the Agreement Creating the European Economic Area, 1 January 2004.

8.    "E.U. Member State" means any of the twenty-seven (27) nations belonging to the E.U.

9.    "E.U. Law" means the EC Treaty and the EEA Agreement, individually and collectively.

10.    "Regulation 1/2003" means Article 6 of the Council Regulation (EC) No. 1/2003 of 16 December 2002.

11.    "Undertaking" has the meaning ascribed to it by the EC Treaty, *i.e.*, any entity engaged in an economic activity, which is an activity consisting of offering goods or services on a given market, regardless of the entity's legal status and the way in which it is financed.

## NATURE OF THE ACTION

12.    This action arises out of a global conspiracy among Defendants and their co-conspirators during at least the Class Period to fix, raise, maintain or stabilize the prices of, and allocate customers and geographic territories for, Hard Haberdashery Products, which are used primarily in the garment, apparel and footwear industries for the manufacture of clothes and shoes.

13.    As further alleged herein, Defendants and their co-conspirators acted in concert and agreed, combined and conspired with each other to fix, raise, maintain, stabilize or otherwise artificially inflate the prices of Hard Haberdashery Products. Among other things, they reached understandings or agreements on coordinated price increases and fixed minimum prices. They also agreed to allocate customers, share markets, and exchange commercially important and confidential information. As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Classes paid artificially high prices for Hard Haberdashery Products and have been damaged thereby.

14.    Plaintiffs bring this action:

a.    to recover treble damages for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. §1 pursuant to Section 4 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §15;

b.    to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, for infringements of Article 81 of the EC Treaty pursuant to Regulation 1/2003; and,

c.    insofar as the infringements affected trade between any E.U. Member State and any EFTA/EEA State, to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, for infringements of the EEA Agreement pursuant to Regulation 1/2003.

15.    Plaintiffs bring this action on behalf of the following classes: the U.S. Direct Purchaser Class and the Foreign Direct Purchaser Class (collectively, the "Classes"). The Classes are defined as follows:

3

a.    **U.S. DIRECT PURCHASER CLASS**:

All persons and entities in the United States that
purchased Hard Haberdashery Products directly from
any of the Defendants or any predecessor,
subsidiary, or affiliate of each, at any time during the
period from January 1, 1977 through December 31,
2004, for shipment of those products within, to, or
from the United States;

b.    **FOREIGN DIRECT PURCHASER CLASS**:

The Foreign Direct Purchaser Class consists of the following four

Subclasses:

**U.S. DIRECT FOREIGN SUBCLASS**:

All persons, Undertakings, and other entities
outside the United States that purchased Hard
Haberdashery Products directly or indirectly,
through distributors, brokers or resellers, from
any of the Defendants or any predecessor,
subsidiary, or affiliate of each, at any time
during the period from January 1, 1977 through
December 31, 2004, for shipment of those
products between the U.S. and the rest of the
world, excluding any European Union Member
State;

**E.U. DIRECT FOREIGN SUBCLASS**:

All persons, Undertakings, and other entities
outside the United States that purchased Hard
Haberdashery Products directly or indirectly,
through distributors, brokers or resellers, from
any of the Defendants or any predecessor,
subsidiary, or affiliate of each, at any time
during the period from January 1, 1977 through
December 31, 2004, for shipment of those
products solely between the U.S. and any
European Union Member State;

4

### MIXED U.S.-E.U. FOREIGN SUBCLASS:

All persons, Undertakings, and other entities outside the United States that purchased Hard Haberdashery Products directly or indirectly, through distributors, brokers or resellers, from any of the Defendants or any predecessor, subsidiary, or affiliate of each, at any time during the period from January 1, 1977 through December 31, 2004, for shipment of those products between the U.S. and any European Union Member State, and also for shipment of those products within, to, from, or between any European Union Member State  (excluding shipments of those products to or from the U.S.); and,

### E.U. FOREIGN SUBCLASS:

All persons, Undertakings, and other entities that purchased Hard Haberdashery Products directly or indirectly, through distributors, brokers or resellers, from any of the Defendants or any predecessor, subsidiary, or affiliate of each, at any time during the period from January 1, 1977 through December 31, 2004, for shipment of those products within, to, from, or between any European Union Member State (excluding shipments of those products to or from the U.S.).

All of the foregoing Classes and Subclasses exclude all federal, state, governmental and

national entities and Defendants and their respective predecessors, subsidiaries, affiliates,

and business partners.

5

## DEFENDANT PARTIES

### The Prym Group Defendants

16.     Defendant William Prym GmbH & Co. KG is a company established under the

laws of Germany with its principal place of business located at Zweifaller Strabe 130, D-52224

Stolberg, Germany.  The Prym Group claims to be the oldest family-owned business in Germany,

having been founded in 1530.  In 1924, Hans August Prym established William Prym, Inc.

U.S.A. in New York City as the exclusive U.S. importer and sales agent for the company.

William Prym GmbH & Co. KG is made up of three divisions, with sales offices and production

facilities located in over 60 countries and operating in every major market worldwide.  The three

divisions are Prym Consumer, Prym Fashion and Inovan.  Prym Consumer is a leading global

supplier of sewing products and needlework, as well as fashion accessories, and fasteners such as

snaps, buttons, eyelets, buckles, hooks & eyes and snap attacher tools.  Prym Fashion offers

fastening solutions for clothes and fastening systems for the garment, leather and textile

industries, including press fasteners, zips, jean buttons and rivets, eyelets and washers for every

application, as well as attaching technology, pneumatic presses, semi and fully automatic

machines.  Inovan provides innovative solutions in the fields of material and surface technology,

as well as fasteners and precision mechanical parts.  During the Class Period, William Prym

GmbH & Co. KG manufactured, sold and/or distributed Hard Haberdashery Products to

customers throughout the United States and the world, either directly or through its affiliated

companies.

17.     Defendant Prym Consumer USA, Inc. ("Prym USA") is a part of the Prym

Consumer Group and is a South Carolina corporation with its principal place of business located

6

at 950 Brisack Road, Spartanburg, SC 29303. Prior to 2005, Prym USA was known as the Prym Dritz Corporation. Prym USA is a wholly-owned and controlled subsidiary of a U.S. holding company, William Prym, Inc., which is in turn a wholly-owned and controlled subsidiary of William Prym GmbH & Co. KG. Prym USA is the largest manufacturer and distributor of sewing, quilting and craft-related notions in North America, selling to retailers in the United States under the Dritz® and Prym Sewing™ brands. During the Class Period, Prym USA directly manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States.

18.    Prym Fashion, Inc. is a part of the Prym Fashion Group and is a South Carolina corporation with its principal place of business located at 950 Brisack Road, Spartanburg, SC 29303. Prym Fashion, Inc. is a wholly owned and controlled subsidiary of Prym Inovan GmbH Co. KG of Stolberg, Germany, which is in turn, a wholly-owned and controlled subsidiary of William Prym GmbH & Co. KG. Prym Fashion, Inc. sells under the brands Prym, Fiocchi and Éclair Prym. During the Class Period, Prym Fashion, Inc. directly manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States.

19.    Defendants William Prym GmbH & Co. KG, Prym Consumer USA, Inc. and Prym Fashion, Inc., together with numerous other subsidiaries not named as Defendants here, are collectively referred to herein as "the Prym Group."

### The YKK Group Defendants

20.    Defendant YKK Corporation is a corporation established under the laws of Japan with its principal place of business located at 1, Kanda Izumi-cho, Chiyoda-ku, Tokyo 10 1-8642, Japan. The 119 affiliated companies of the YKK Corporation operate

7

in 70 countries throughout the world. The YKK Corporation, founded in 1934, functions both as the Group headquarters and as a business entity, whose main businesses are the "Fastening Products Group" and the "Machinery and Engineering Group." YKK Corporation opened its first United States office in New York in 1960. The YKK Corporation is the largest manufacturer of zippers in the world with 50% of the worldwide market share. The YKK Group counts multinational clothing companies Levi Strass, Adidas and Nike as global clients. During the Class Period, the YKK Corporation manufactured, sold and/or distributed Hard Haberdashery Products under the YKK® brand to customers throughout the United States and the world, either directly or through its affiliated companies.

21.    Defendant YKK Corporation of America, Inc. is a New York corporation with its principal places of business located at One Parkway Center, 1850 Parkway Place, Suite 300, Marietta, Georgia 30067 and 301 Route 17 North, Suite 503, Rutherford, New Jersey 07070. YKK Corporation of America is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. YKK Corporation of America, Inc. is the YKK Group's Western Hemisphere parent. During the Class Period, YKK Corporation of America manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States and the Western Hemisphere, either directly or through its affiliated companies.

22.    Defendant YKK (U.S.A.) Inc. is a New York corporation with its principal place of business located at 1300 Cobb Industrial Drive, Marietta, Georgia 30066. YKK (U.S.A.) Inc. is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. YKK (U.S.A.) Inc. operates the Fastening Products Group in the United States,

8

with sales and service offices located in Rutherford, New Jersey; New York, New York; Anaheim, California; Renton, Washington; Addison, Texas; El Paso, Texas; and Glenview, Illinois. YKK (USA) Inc. is the largest zipper producer in the United States with over 1000 styles and colors. During the Class Period, YKK (U.S.A.) Inc. manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States, either directly or through its affiliated companies.

23.    Defendant YKK Snap Fasteners America, Inc. is a Delaware corporation with its principal place of business located at 302 Factory Avenue, Lawrenceburg, Kentucky 40342, and with manufacturing plants located at 1090 Industry Road, Lawrenceburg, Kentucky 40342 and 200 Universal Drive, Centerville, Tennessee 37033. YKK Snap Fasteners America, Inc. is a part of the Fastening Products Group and operates sales offices in El Paso, Texas and New York, New York. YKK Snap Fasteners America, Inc. is ultimately a wholly-owned and controlled subsidiary of the parent, defendant YKK Corporation. Founded in 1895, predecessors of YKK Snap Fasteners America, Inc. have been making Hard Haberdashery Products in the United States for more than 100 years, joining forces in 1987 with YKK Corporation, the world's foremost zipper manufacturer. During the Class Period, YKK Snap Fasteners America, Inc. manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States, either directly or through its affiliated companies.

24.    YKK Group brands and trademarks sold in the United States include Vislon®, YZip®, Ever Bright®, Excella®, Eflon®, Flat Knit™, PowerHook™, Metallion®, Conceal®,

9

AquaGuard®, Lumifine®, Cyberloc™, Crystalloc™, Hammerloc™, Locwave™, Spacedome™, Shockonloc™, Zipcap™, L-Type®, Locwave™, and Prifa®.

//

//

//

25.    Defendants YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc. and YKK Snap Fasteners America, Inc., together with the numerous other subsidiaries of the YKK Corporation not named as Defendants here, are collectively referred to herein as "the YKK Group."

### The Coats Group Defendants

26.    Defendant Coats plc is a corporation established under the laws of the United Kingdom with its principal place of business located at 1 The Square, Stockley Park, Uxbridge, Middlesex, UB11 ITD, United Kingdom. Coats was founded in 1755 and listed on the London Stock Exchange in 1890. Since April 2004, Guinness Peat Group plc has owned 100% of the ordinary shares in Coats Group Limited, which in turn owns 100% of the ordinary shares in Coats plc. When Guinnes Peat Group plc acquired a partial interest in Coats plc in 2003, Coats plc's shares were delisted from the London Stock Exchange. Coats plc was known by several other names during the Class Period prior to 2001, including Coats Patons plc (1961 to 1986) and Coats Viyella plc (1986 to 2001) before being renamed Coats plc in 2001. Coats is the world's second largest manufacturer of zippers (known in the United Kingdom as "zips"). Its zippers are sold under the Opti® and Opti-lon® brands and are suitable for all kinds of

10

industrial applications in the apparel and specialty sectors. The Coats Group also claims to be the fastest growing zipper manufacturer in the world. During the Class Period, Coats plc and its predecessor entities manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States and 67 countries throughout the world, either directly or through its affiliated companies.

27.    Defendant Coats North America de Republica Dominicana, Inc. ("Coats North America") is a North Carolina corporation with its principal places of business located at 3430 Torington Way, Suite 301, Charlotte, North Carolina 28201 and 4135 South Stream Blvd., Charlotte, North Carolina 28277. Coats North America is a wholly-owned and controlled subsidiary of defendant Coats plc. During the Class Period, Coats North America manufactured, sold and/or distributed Hard Haberdashery Products to customers throughout the United States, either directly or through its affiliated companies.

28.    Coats plc and Coats North America, together with their parents and numerous other subsidiaries not named as Defendants here, will be referred to herein as "the Coats Group."

### The Scovill Defendant

29.    Defendant Scovill Fasteners, Inc. ("Scovill") is a Delaware corporation founded in 1802 in Waterbury, Connecticut, which as of 1998 has had its principal place of business relocated to 1802 Scovill Drive, Clarkesville, Georgia 30523. During the Class Period, Scovill manufactured, sold and/or distributed Hard Haberdashery Products under the DOT® brand to customers throughout the United States and the world.

11

30.    Scovill brands sold in the United States include Gripper®, DOT®, Lift-the-DOT®, Pull-the-DOT®, DuraMark®, Whispersnap™, Maxi-Snap™ and Might-Snap™.

31.    All Defendants – the Prym Group, the YKK Group, the Coats Group, and Scovill – are parties to all Counts alleged herein.

//

//

//

## UNNAMED CO-CONSPIRATORS

32.    At all relevant times, other natural persons, corporations, or entities, the identities of which are presently unknown, and which are not named as Defendants herein, willingly conspired with Defendants in their unlawful restraint of trade.

33.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction or control of its affairs.

34.    All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

## AGENTS

35.    The acts alleged to have been done by any Defendant were authorized, ordered or done by its directors, officers, managers, agents, employees or representatives while actively engaged in the management of that Defendant's affairs.

12

## PLAINTIFF PARTIES

36.    All Plaintiffs are identified in Counts I through V below, according to the respective claims asserted.

## FACTUAL ALLEGATIONS

### Interstate And International Trade And Commerce

37.    The Hard Haberdashery Products global industry involves billions of dollars of business annually. Hundreds of millions of dollars in commerce annually is involved in shipments to North America and from Europe.

38.    The Hard Haberdashery Products market includes, but is not limited to, zippers, fasteners, snap fasteners, open prong fasteners, capped fasteners, hooks & eyes, rivets, burrs, post or prong rings, boot hooks, eyelets, tack buttons, sockets, backplates, studs, screw studs, posts, washers, grommets, caps, locking fasteners, and "notions" or small items of numerous kinds and types (excluding needles and pins), and their attaching machines.

39.    Hard Haberdashery Products are used for fastening materials together in a wide variety of products, primarily in the garment, apparel and footwear industries for the manufacture of clothes and shoes. For example, zip fasteners temporarily join two adjoining pieces of fabric, whereas snap fasteners are a pair of interlocking discs commonly used in place of buttons to fasten clothing. Snaps can be attached to material by hammering, plying or sewing. For plying snap fasteners, there are special snap pliers. Other textile fasteners employ systems such as hook elements, mushroom elements, and loop elements for the purpose of binding fabrics.

13

40.    Demand for Hard Haberdashery Products is driven by the industries in which they are applied.

41.    Hard Haberdashery Products are fungible, commodity products such that those manufactured and sold by one company are readily substitutable for those manufactured and sold by another. As a result, price is the primary factor driving customer choice.

42.    Throughout the Class Period, there was a continuous and uninterrupted flow of transactions and shipments involving Hard Haberdashery Products in interstate and international commerce throughout the United States and throughout the world, including between and among E.U. Member States, non-member States, the EFTA/EEA States, and non-EFTA/EEA States, affecting trade therein.

43.    Defendants' unlawful activities, as described herein, took place within and affected the flow of interstate commerce to Hard Haberdashery Products customers located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce.

**The EC Levies Fines Against The Hard Haberdashery Cartel**

44.    On September 19, 2007, the European Commission ("EC") announced in a press release the results of a nearly six-year investigation into suspected anti-competitive conduct involving the world's largest manufacturers of Hard Haberdashery Products. The EC's press release disclosed that an EC investigation had uncovered a

14

global conspiracy to fix the prices of Hard Haberdashery Products and also to allocate customers and markets for these products worldwide.

45.     According to the EC's press release, the EC investigation began after "certain information had been brought to its attention." This information prompted the EC in November 2001 to conduct surprise inspections on the premises of several producers of "hard and soft haberdashery" products used for sewing garments and in the manufacture of apparel and footwear.

46.     Inspections by the EC of certain Defendants' records concerning hard and soft haberdashery sales, pricing, marketing and distribution occurred in November 2001.

47.     The EC inspections in November 2001 triggered applications by the Prym Group, the Coats Group, and the YKK Group - the three largest manufacturers in the Hard Haberdashery Products industry – for immunity or a reduction of fines under the EC's leniency program.

48.     The EC inspections and investigation uncovered evidence showing that the major companies in the industry had joined together to illegally reduce competition in the market for "zip fasteners" (zippers) and "other fasteners," which the EC indicated were fastening devices other than zippers, such as snap buttons and rivets, and "their attaching machines." These products are defined collectively herein as Hard Haberdashery Products.

49.     The EC imposed substantial fines totaling over _328 million on Defendants the Prym Group, the YKK Group, the Coats Group, and Scovill, as well as on unnamed co-conspirators A Raymond S.A.R.L., Berning & Soehne GmbH & Co. KG, and the German trade association Fachverband Verbindungs-und Befestigungstechnik ("VBT"), for operating a cartel in Europe and *worldwide*.

15

50.    The EC's press release further noted that any person or firm damaged by the anti-competitive behavior described in the release may bring a private action for damages "submitting elements of the published decision as evidence that the behavior took place and was illegal . . . ."

51.    The evidence of the international conspiracy in Hard Haberdashery Products was confirmed by documents produced to the EC by the Defendants during the investigation and also by statements provided by representatives of the three Defendant leniency program applicants.

52.    The evidence gathered by the EC revealed that for many years there had been a cartel operating in the Hard Haberdashery Products industry with the purpose of fixing prices and allocating customers and markets "*on a worldwide level*." (Emphasis added.)

53.    The EC determined that high-ranking management, such as managing directors, sales directors and board members, participated in regular meetings and discussions with competitors during which the unlawful actions took place.

54.    The EC possesses evidence that the companies and these high-ranking managers were well aware that their behavior was illegal.

55.    The EC's disclosures concerning the Hard Haberdashery Products cartel do not limit the cartel's operation to Europe, but rather indicate that a global cartel was operated by multi-national companies.

56.    The Prym Group issued a Press Release on September 19, 2007 stating as follows: "The members of the board of management of the Prym Group in charge at the times of the cartels, who are no longer active in the Prym undertakings, have at all times *admitted the participation* and cooperated with the Commission in its investigations." (Emphasis added.)

57.    The EC's September 19, 2007 press release further stated that the Prym Group

16

received full immunity from fines under the Commission's leniency program "in respect of the *worldwide cartel* on the markets for other fasteners and attaching machines," as it was the first to provide information about the cartel for "other fasteners and their attaching machines." (Emphasis added.)

58.    EC Competition Commissioner Neelie Kroes stated that the conspiracy among these "major fastening technology producers" maintained artificial price levels and included agreements to allocate customers and markets.

59.    The three largest producers of Hard Haberdashery Products in the world - the Prym Group, the YKK Group and the Coats Group - received complete or partial immunity and reduction of fines, meaning they effectively admitted the existence of the conspiracy, identified the participants in the conspiracy, provided evidence of the conspiracy, and confessed to their own and their co-conspirators' participation in the unlawful conduct.

### The Hard Haberdashery Products Conspiracy
### Affected Worldwide Commerce

60.    The combination or conspiracy began at least as early as 1977 when the Prym Group and the Coats Group agreed to divide and share markets for Hard Haberdashery Products worldwide.

61.    Thereafter, at least by 1991 if not earlier, the YKK Group and Scovill, and others not named as Defendants herein, joined the combination and conspiracy.

62.    Pursuant to the combination and conspiracy, Defendants jointly and secretly agreed, among other things, as follows:

      a.    to share the worldwide market for Hard Haberdashery Products;

      b.    to fix prices and agree on coordinated price increases in annual "price

17

rounds;"

      c.     to exchange price information and to discuss price increases;

      d.     to fix prices on a product-by-product and country-by-country basis; and,

      e.     to refrain from pursuing and/or acquiring each others' customers and

otherwise allocate customers on a worldwide level.

63.     All of these actions were conducted as a part of a continuous, decades-long, global

conspiracy beginning in at least 1977 and continuing until on or about December 31, 2004.

64.     No Defendant ever withdrew from the conspiracy and thus all Defendants are

jointly and severally liable for all of the unlawful conduct under the antitrust laws.

65.     Defendants' wrongful acts complained of herein were done knowingly,

intentionally, purposefully, and willfully, and were carried out with knowledge of and willful

disregard of the rights of Plaintiffs and the Classes they represent, in a calculating fashion and/or

with the expectation of profiting therefrom in an amount exceeding the amounts payable by them

to Plaintiffs and the Classes, as a result of such wrongful actions.

## Industry Meetings

66.     Representatives of Defendants have regularly met through such

organizations as the German trade association Fachverband Verbindungs- und

Befestigungstechnik ("VBT"), at which meetings (and others) the conspiracy was

organized and operated.

67.     For example, the companies agreed, among other things, on coordinated

price increases in annual "price rounds," in the framework of the work circles organized

by VBT.

## Structural Characteristics Of The Industry

68.    A number of structural characteristics of the Hard Haberdashery Products industry facilitate the implementation and maintenance of the worldwide, horizontal conspiracy alleged herein.

69.    Hard Haberdashery Products may differ in size, material and color, and in other respects, but are commodity-like products. Fasteners come in standard sizes, which may vary by product type. Major suppliers advertise their products under standard trade names, suggesting that such products are easily characterized in the market by material composition, design and function.

70.    It is easier to form and sustain a cartel when the product in question is commodity-like, because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

71.    The Hard Haberdashery Products industry is highly concentrated, a factor that facilitates the coordination of prices. A large share of production is controlled by a few players. YKK is the largest zipper manufacturer with approximately 50% of the worldwide market share. Coats is the second largest producer. Together with Prym, these three Defendants exercise control of the Hard Haberdashery Products market worldwide.

72.    High concentration facilitates coordination because there are fewer cartel members among which to coordinate pricing and allocate markets or customers. The pricing and production of other cartel members also can be more easily monitored.

73.    There appear to be few, if any, available substitutes for Hard Haberdashery

19

Products.  When there are substitutes available, the effect of supra-competitive pricing is to induce switching by purchasers to substitute products.  When no substitutes are available, cartel members can raise the price without purchasers being able to switch from the product to a substitute.  The lack of available substitutes for a product facilitates collusion among competitors.

74.     Defendants all sell as horizontal competitors at the same wholesale and retail levels of the distribution chain.  When sellers operate at different levels of the distribution chain, it is more difficult to monitor adherence to a cartel arrangement.  When sellers operate at the same level of the distribution chain, as in the Hard Haberdashery Products industry, it is easier to monitor adherence to such an arrangement.

75.     Defendants sell and Plaintiff and members of the Class purchase Hard Haberdashery Products primarily on the basis of price.  One Defendant's Hard Haberdashery Products are substitutable for another's.  Price is the most important competitive factor in the Hard Haberdashery Products industry, and the standardized nature of Hard Haberdashery Products hinders substantial and material non-price competition.

**Fraudulent Concealment**

76.     Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes.

77.     Plaintiffs and members of the Classes did not discover and could not have discovered, through the exercise of reasonable diligence, which they in fact exercised, the existence of the Hard Haberdashery Products conspiracy alleged herein until, at the earliest, September 2007, when the EC issued a press release announcing that it had levied fines against

20

Defendants and the other cartelists, because Defendants and their co-conspirators actively and fraudulently concealed the existence of the conspiracy.

78.     Because Defendants' conspiracy was actively concealed, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct alleged herein and did not know that they had been paying artificially high prices for Hard Haberdashery Products during the Class Period.

79.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

80.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

81.     Defendants met and communicated secretly concerning the pricing and marketing of Hard Haberdashery Products so as to avoid detection. This conduct included anti-competitive agreements, entered into at least as early as 1977, in which Prym and Coats decided to share markets for Hard Haberdashery Products and not compete with each other worldwide. Indeed, high-level employees of Defendants met and spoke with each other routinely during the Class Period. For example, during the 1990s, they met on dozens of occasions, at least once if not many times each year. These meetings were concealed from Defendants' customers.

82.     By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

83.     Defendants gave false, pre-textual, and misleading reasons for their price increases of Hard Haberdashery Products during the Class Period.

84.    Defendants' price increase announcements during the Class Period constituted implicit statements that the price increases in question were legitimate and the result of legitimate competitive market forces.  Plaintiffs were thus conditioned by experience in dealing with Defendants in what Plaintiffs believed to be a competitive industry to expect price increases from time to time.

85.    At no time during the Class Period did any Defendant disclose the existence of the Hard Haberdashery Products cartel and conspiracy.  During the Class Period, Plaintiffs were lulled into believing that price increases were the normal result of competitive market forces rather than the product of collusive, unlawful efforts.  Defendants' statements to customers about price increases were designed to, and did, put Plaintiffs and members of the Classes off guard and cause them to accept the price increases without undertaking further inquiry.  Even had

//

//

such inquiry been undertaken, it would have proven futile, because Plaintiffs and members of the Classes did not have access to contemporaneous information that would have allowed them to evaluate whether each Defendant's claimed justifications for price increases were valid.

86.    At the time of price increases during the Class Period, Plaintiffs considered Defendants' articulated reasons for their price increases to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' price increases.

87.    Plaintiffs and members of the Classes could not have discovered the alleged cartel and conspiracy during the Class Period by the exercise of reasonable diligence because of the

deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases, and surreptitious communications among Defendants at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

88.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators during the Class Period, Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

89.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims of Plaintiffs and members of the Classes as a result of the anti-competitive conduct alleged in this Complaint.

### COUNT I
### VIOLATION OF THE SHERMAN ACT
### (ON BEHALF OF DOMESTIC DIRECT PURCHASERS)

90.     The Domestic Direct Purchaser Plaintiffs described in this count incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 89 of this Complaint.

23

## U.S. Direct Purchaser Plaintiffs

91.    Plaintiff Kappler, Inc. is incorporated in Alabama and its principal place of business is located in Guntersville, Alabama. During the Class Period, Kappler, Inc. purchased Hard Haberdashery Products directly from one or more of the Defendants for shipment of those products within, to, or from the United States and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

92.    During the Class Period, the U.S. Direct Purchaser Plaintiff, Kappler, Inc., and the U.S. Direct Purchaser Class paid for Hard Haberdashery Products directly to Defendants (or their agents, subsidiaries, and/or controlled affiliates).

## Defendants

93.    Defendants include those parties alleged in paragraphs 16 through 31 of this Complaint.

## Jurisdiction And Venue

94.    The claims of the U.S. Direct Purchaser Plaintiff and the members of the U.S. Direct Purchaser Class for injuries sustained by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages, with appropriate interest, and the costs of this suit, including reasonable attorneys' fees.

95.    This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Count, pursuant to 28 U.S.C. §§1331, 1337, and Section 4 of the Clayton Act, 15 U.S.C. §15.

24

96.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the

Clayton Act, 15 U.S.C. §§15 and 22, and 28 U.S.C. §1391(b), (c), and (d), because during the

Class Period one or more of the Defendants resided, transacted business, were found, or had

agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred

and a substantial portion of the affected interstate trade and commerce described below has been

carried out in this district.

97.    This Court has *in personam* jurisdiction over each of the defendants because, *inter

alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in

this district and directed the unlawful conspiracy through persons and entities located in this

district, including fixing the prices of Hard Haberdashery Products sold to purchasers in this

district; (b) transacted business in Hard Haberdashery Products and other products in this

district; (c) maintains and has maintained continuous and systematic contacts with this

district over a period of years; (d) has substantial aggregate contacts with the United

States as a whole; and/or (e) has purposefully availed itself of the benefits of doing

business in this district. Accordingly, each of the defendants maintains minimum

contacts with this district more than sufficient to subject it to service of process and

sufficient to comply with due process of law.

98.    Alternatively, there is jurisdiction over foreign defendants pursuant to Federal

Rule of Civil Procedure 4(k)(2).

**Class Action Allegations**

99.    U.S. Direct Purchaser Plaintiff brings this action on its own behalf and as

a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf

25

of the following Class:

> All persons and entities in the United States (excluding
> governmental entities, Defendants, and Defendants'
> respective predecessors, subsidiaries, affiliates, and
> business partners) that purchased Hard Haberdashery
> Products directly from any of the Defendants or any
> predecessor, subsidiary, or affiliate of each, at any time
> during the period from January 1, 1977 through December
> 31, 2004, for shipment of those products within, to, or from
> the United States.

100.    Because such information is in the exclusive control of Defendants, U.S. Direct Purchaser Plaintiff does not know the exact number of the members of the U.S. Direct Purchaser Class. Due to the nature of the trade and commerce involved, however, U.S. Direct Purchaser Plaintiff believes that the members of the U.S. Direct Purchaser Class number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all members of the U.S. Direct Purchaser Class is impracticable.

101.    There are questions of law or fact common to the U.S. Direct Purchaser Class which will predominate over any questions that may affect only individual members, including:

a.      whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize the prices of Hard Haberdashery Products charged in the United States and throughout the world;

26

    b.    whether Defendants violated Section 1 of the Sherman Act;

    c.    the duration of the conspiracy alleged in this Complaint;

    d.    the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

    e.    whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of U.S. Direct Purchaser Plaintiff and the members of the U.S. Direct Purchaser Class;

    f.    the effect of Defendants' conspiracy on the prices of Hard Haberdashery Products charged in the United States and throughout the world during the Class Period;

    g.    whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

    h.    whether damages can be shown on a class-wide basis; and,

    i.    the appropriate measure of damages sustained by U.S. Direct Purchaser Plaintiff and members of the U.S. Direct Purchaser Class.

102.    The U.S. Direct Purchaser Plaintiff, Kappler, Inc., is a member of the U.S. Direct Purchaser Class, having directly purchased Hard Haberdashery Products from one or more of the Defendants during the Class Period.

//

//

103.    The prosecution of separate actions by individual members of the U.S. Direct Purchaser Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

a.    The U.S. Direct Purchaser Class is readily definable and one for which records should exist in the files of Defendants.

b.    Prosecution as a class action will eliminate the possibility of repetitious litigation.

c.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

d.    Class treatment will permit the adjudication of relatively small claims by many class members on an efficient and manageable basis.

e.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

105.    The U.S. Direct Purchaser Plaintiff's claims are typical of the claims of other U.S. Direct Purchaser Class members.

106.    The U.S. Direct Purchaser Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation and who will fairly and adequately protect the interests of the members of the U.S. Direct Purchaser Class.

107.    The U.S. Direct Purchaser Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the U.S. Direct Purchaser Class with respect to the subject matter of this litigation.

28

**Injury To The U.S. Direct Purchaser Plaintiff And U.S. Direct Purchaser Class**

108.   The combination and conspiracy alleged herein had the following effects, among others:

a.   The prices charged by Defendants to, and paid by, U.S. Direct Purchaser Plaintiff and members of the U.S. Direct Purchaser Class for Hard Haberdashery Products were fixed, raised, maintained or stabilized at artificially high and non-competitive levels;

b.   U.S. Direct Purchaser Plaintiff and members of the U.S. Direct Purchaser Class have been deprived of free and open competition in the purchase of Hard Haberdashery Products in the United States and worldwide;

c.   U.S. Direct Purchaser Plaintiff and members of the U.S. Direct Purchaser Class were required to pay more for Hard Haberdashery Products in the United States than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.   Competition in the sale of Hard Haberdashery Products has been restrained, suppressed or eliminated.

109.   During the Class Period, Defendants' Hard Haberdashery Products conspiracy as described herein directly and proximately caused U.S. Direct Purchaser Plaintiff and the members of the U.S. Direct Purchaser Class to pay artificially inflated prices for Hard

//

//

Haberdashery Products that they would not have paid absent such violations.  As a result, U.S. Direct Purchaser Plaintiff and the members of the U.S. Direct Purchaser Class have been injured and damaged in their business and property in an amount to be determined according to proof.

**Violation Alleged**

110.    During the Class Period, the exact dates being unknown to the U.S. Direct

Purchaser Plaintiff, Defendants engaged in a continuing agreement, understanding,

and

conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of

Hard Haberdashery Products and to allocate customers in the United States and

throughout the world through the means described in this Complaint in violation of

Section 1 of the Sherman Act, 15 U.S.C. §1.

111.    In formulating and effectuating the alleged contract, combination, or

conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of

which were to artificially raise, fix, maintain, or stabilize the prices of Hard Haberdashery

Products.

112.    During the Class Period, Defendants sold Hard Haberdashery Products in

a continuous and uninterrupted flow of interstate and foreign commerce.   Defendants

received payment for such products across state and national boundaries.  Defendants'

activities, and the sale of their services, have both taken place within, and have had a

substantial anti-competitive effect upon, interstate commerce within the United States

and foreign commerce.

113.    Defendants' anti-competitive activities and their effects are in violation of the

Sherman Act.

114.    Defendants' anti-competitive activities both inside the United States and in

foreign nations have caused injury to the U.S. Direct Purchaser Plaintiff and the U.S. Direct

Purchaser Class.

115.    U.S. Direct Purchaser Plaintiff and the U.S. Direct Purchaser Class seek treble

damages for their injuries and any such other relief that the Court deems necessary and

appropriate.

## COUNT II
## VIOLATION OF THE SHERMAN ACT
## (ON BEHALF OF U.S. DIRECT FOREIGN PURCHASERS)

116.    The U.S. Direct Foreign Plaintiffs described in this Count incorporate by

reference as if fully set forth herein the allegations contained in paragraphs 1 through 89 of this

Complaint.

### U.S. Direct Foreign Plaintiffs

117.    Plaintiff Kappler Canada is headquartered at 105 Scott Avenue, Paris, Ontario,

Canada.  During the Class Period, Kappler Canada (the "U.S. Direct Foreign Plaintiff")

purchased Hard Haberdashery Products directly or indirectly, through distributors, brokers or

resellers, from one or more of Defendants for shipment of those products between the

U.S. and the rest of the world, specifically, Canada, and has suffered pecuniary injury

as a result of the antitrust violations alleged herein.

118.    During the Class Period, the U.S. Direct Foreign Plaintiff and the members of the

U.S. Direct Foreign Subclass paid for Hard Haberdashery Products directly to Defendants (or

their agents, subsidiaries, and/or controlled affiliates).

### Defendants

31

119.    Defendants include those parties alleged in paragraphs 16 through 31 of this Complaint.

### Jurisdiction And Venue

120.    The claims of the U.S. Direct Foreign Plaintiff and the members of the U.S. Direct Foreign Subclass for injuries sustained by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages, or the present value of actual damages sustained by them, with appropriate interest, and the costs of this suit, including reasonable attorneys' fees.

121.    This Court has original federal question jurisdiction over all Sherman Act claims asserted in this Count, pursuant to 28 U.S.C. §§1331, 1337, and Section 4 of the Clayton Act, 15 U.S.C. §15.

122.    This Court has original diversity jurisdiction over all claims brought in this Count pursuant to 28 U.S.C. §1332(d)(2)(B) because the amount in controversy in this action exceeds the sum of $5 million, exclusive of interests and costs, and at least one member of the Class of Plaintiffs is a citizen of a foreign state, and at least one Defendant is a citizen of a State.

123.    This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) over all claims asserted herein by the U.S. Direct Foreign Plaintiff and the U.S. Direct Foreign Subclass because they arise from the same nucleus of operative facts alleged in this Complaint, and are so related to the Sherman Act claims of the U.S. Direct Purchaser Class over which this Court has original jurisdiction that they form part of the same case or controversy.

124.    Defendants engaged in conduct both inside and outside of the U.S. that caused direct, substantial and reasonably foreseeable anti-competitive effects upon interstate commerce within the U.S. and upon foreign commerce, giving rise to the claims of the U.S. Direct Foreign Plaintiff and the members of U.S. Direct Foreign Subclass. The adverse effects of this anti-competitive conduct in the U.S. are interdependent with, and are linked directly to, the adverse effects outside the U.S. and gave rise to the injuries of the U.S. Direct Foreign Plaintiff and the members of U.S. Direct Foreign Subclass. Defendants could not have maintained their international price-fixing arrangement for Hard Haberdashery Products that caused foreign injury to the U.S. Direct Foreign Plaintiff and the members of U.S. Direct Foreign Subclass without impacting adversely the prices of Hard Haberdashery Products in the U.S.

125.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§15 and 22, and 28 U.S.C. §1391(b), (c), and (d), because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

<u>**Class Action Allegations**</u>

126.    U.S. Direct Foreign Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Subclass:

//

//

33

All persons, Undertakings, and other entities outside the
United States (excluding governmental entities, Defendants,
and Defendants' respective predecessors, subsidiaries,
affiliates, and business partners) that purchased Hard
Haberdashery Products directly or indirectly, through
distributors, brokers or resellers, from any of the Defendants
or any predecessor, subsidiary, or affiliate of each, at any
time during the period from January 1, 1977 through
December 31, 2004, for shipment of those products between
the U.S. and the rest of the world, excluding any European
Union Member State.

127.    Because such information is in the exclusive control of Defendants, U.S.
Direct Foreign Plaintiff does not know the exact number of members of the U.S. Direct
Foreign Subclass.  Due to the nature of the trade and commerce involved, however,
U.S. Direct Foreign Plaintiff believes that the members of the U.S. Direct Foreign
Subclass number at least in the thousands and are sufficiently numerous and
geographically dispersed throughout the United States and the world so that joinder of
all members of the U.S. Direct Foreign Subclass is impracticable.

128.    There are questions of law or fact common to the U.S. Direct Foreign Subclass
which will predominate over any questions that may affect only individual members, including:

a.    whether Defendants engaged in a combination or conspiracy among
themselves to fix, raise, maintain, and/or stabilize the prices of Hard Haberdashery Products

34

charged in the United States and throughout the world;

      b.    whether Defendants violated Section 1 of the Sherman Act;

      c.    the duration of the conspiracy alleged in this Complaint;

      d.    the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

      e.    whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of U.S. Direct Foreign Plaintiff and the other members of the U.S. Direct Foreign Subclass;

      f.    the effect of Defendants' conspiracy on the prices of Hard Haberdashery Products charged in the United States and throughout the world during the Class Period;

      g.    whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

      h.    whether damages can be shown on a class-wide basis; and

      i.    the appropriate measure of damages sustained by U.S. Direct Foreign Plaintiff and other members of the U.S. Direct Foreign Subclass.

129.    The U.S. Direct Foreign Plaintiff is a member of the U.S. Direct Foreign Subclass, having directly purchased Hard Haberdashery Products from one or more of the Defendants.

130.    The prosecution of separate actions by individual members of the U.S. Direct Foreign Subclass would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

131.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

      a.     The U.S. Direct Foreign Subclass is readily definable and one for which records should exist in the files of Defendants.

      b.     Prosecution as a class action will eliminate the possibility of repetitious litigation.

      c.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

      d.     Class treatment will permit the adjudication of relatively small claims by many class members on an efficient and manageable basis.

      e.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

132.    The U.S. Direct Foreign Plaintiff's claims are typical of the claims of other U.S. Direct Foreign Subclass members.

133.    The U.S. Direct Foreign Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation, and who will fairly and adequately protect the interests of the members of the Foreign Class and the U.S. Direct Foreign Subclass.

134.    The U.S. Direct Foreign Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Foreign Class and the U.S. Direct Foreign Subclass with respect to the subject matter of this litigation.

**<u>Injury To the U.S. Direct Foreign Plaintiff And U.S. Direct Foreign Subclass</u>**

36

135.    The combination and conspiracy alleged herein had the following direct, substantial, and reasonably foreseeable anti-competitive effects, among others, upon commerce in the U.S. and upon foreign commerce:

//

//

a.    The prices charged by Defendants to, and paid by, U.S. Direct Foreign Plaintiff and members of the U.S. Direct Foreign Subclass for Hard Haberdashery Products were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    U.S. Direct Foreign Plaintiff and members of the U.S. Direct Foreign Subclass have been deprived of free and open competition in the purchase of Hard Haberdashery Products in the United States and worldwide;

c.    U.S. Direct Foreign Plaintiff and members of the U.S. Direct Foreign Subclass were required to pay more for Hard Haberdashery Products in the United States and worldwide than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d.    Competition in the sale of Hard Haberdashery Products has been restrained, suppressed or eliminated.

136.    The conduct alleged herein significantly and adversely affected customers worldwide, including the U.S. Direct Foreign Plaintiff and the members of the U.S. Direct Foreign Subclass. The adverse effects of Defendants' conduct in the United States and the adverse effects outside the United States were interdependent and inextricably bound.

137.    During the Class Period, Defendants' anti-competitive conduct as described

37

herein directly and proximately caused U.S. Direct Foreign Plaintiff and the members of the U.S.

Direct Foreign Subclass to pay artificially inflated prices for Hard Haberdashery Products that

they would not have paid absent such violations.  As a result, U.S. Direct Foreign Plaintiff and

the members of the U.S. Direct Foreign Subclass have been injured and damaged in their

business and property in an amount to be determined according to proof.

### **Violation Alleged**

138.    During the Class Period, the exact dates being unknown to the U.S. Direct

Foreign Plaintiff, Defendants engaged in a continuing agreement, understanding, and

conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the

prices of Hard Haberdashery Products in the United States and throughout the world,

and to allocate customers in the United States and throughout the world, through the

means described in this Complaint in violation of Section 1 of the Sherman Act, 15

U.S.C. §1.

139.    In formulating and effectuating the alleged contract, combination, or conspiracy,

Defendants engaged in anti-competitive activities, the purpose and effect of which were to

artificially raise, fix, maintain, and/or stabilize the prices of Hard Haberdashery Products and to

allocate the customers for such products.

140.    Defendants' illegal combination and conspiracy alleged herein has had the

following effects, among others:

      a.    price competition in the charging for Hard Haberdashery Products has been

restrained, suppressed, and/or eliminated;

      b.    price competition in customer contracts for the purchase of Hard

38

Haberdashery Products has been restrained, suppressed, and/or eliminated;

         c.     prices charged by Defendants for Hard Haberdashery Products have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

         d.     prices paid by the U.S. Direct Foreign Plaintiff and the members of the U.S. Direct Foreign Subclass have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

         e.     U.S. Direct Foreign Plaintiff and the members of the U.S. Direct Foreign Subclass have been deprived of the benefit of free and open competition.

141.    Defendants' anti-competitive activities and their effects are in violation of the Sherman Act.

142.    During the Class Period, Defendants sold Hard Haberdashery Products in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state and national boundaries. Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anti-competitive effect upon, interstate commerce within the United States and foreign commerce.

143.    Defendants' anti-competitive activities both inside the United States and in foreign nations have caused injury to the U.S. Direct Foreign Plaintiff and the members of the U.S. Direct Foreign Subclass.

144.    Defendants' anti-competitive activities and their U.S. effects are interdependent with their foreign effects and have proximately caused injury to the U.S. Direct Foreign Plaintiff and U.S. Direct Foreign Subclass both inside the United States and in foreign nations.

145.    The U.S. Direct Foreign Plaintiff and U.S. Direct Foreign Subclass seek treble

damages or the present value of actual damages sustained by them, with appropriate interest, and any such other relief that the Court deems necessary and appropriate.

## COUNT III
### VIOLATIONS OF THE SHERMAN ACT AND E.U. LAW
### (ON BEHALF OF E.U. DIRECT FOREIGN PURCHASERS)

146.    The E.U. Direct Foreign Plaintiffs described in this count incorporate by reference as if fully set forth herein the allegations contained paragraphs 1 through 89 of this Complaint.

### E.U. Direct Foreign Plaintiffs

147.    Plaintiff Kappler Ltd. is headquartered at Crown Farm Way, NG19 OFT, Mansfield, Nottinghamshire, England.  During the Class Period, Kappler Ltd. (the "E.U. Direct Foreign Plaintiff") purchased Hard Haberdashery Products directly or indirectly, through distributors, brokers or resellers, from one or more of the Defendants for shipment of those products solely between the U.S. and an E.U. Member State, and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

148.    During the Class Period, the E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass paid for Hard Haberdashery Products directly to Defendants (or their agents, subsidiaries, and/or controlled affiliates).

### Defendants

149.    Defendants include those parties alleged in paragraphs 16 through 31 of this Complaint.

### Jurisdiction And Venue

150.    The claims of the E.U. Direct Foreign Plaintiff and the members of the E.U. Direct Foreign Subclass for injuries sustained by reason of Defendants' violations

40

of Section 1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to Section 4 of the

Clayton Act, 15 U.S.C. §15, to recover treble damages or the present value of actual

damages sustained by them and aggravated or exemplary damages, with appropriate

interest, as well as the costs of this suit, including reasonable attorneys' fees.

//

//

151.    This Court has original federal question jurisdiction over all Sherman Act claims

asserted in this Count, pursuant to 28 U.S.C. §§1331, 1337, and Section 4 of the Clayton Act,

15 U.S.C. §15.

152.    This Court has original diversity jurisdiction over all claims brought in this Count

pursuant to 28 U.S.C. §1332(d)(2)(B) because the amount in controversy in this action exceeds

the sum of $5 million, exclusive of interests and costs, and at least one member of the Class of

Plaintiffs is a citizen of a foreign state, and at least one Defendant is a citizen of a State.

153.    This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) over the

Sherman Act claims asserted in this Count by the E.U. Direct Foreign Plaintiff and E.U. Direct

Foreign Subclass because they arise from the same nucleus of operative facts alleged in this

Complaint, and are so related to the Sherman Act claims of the U.S. Direct Purchaser Class over

which this Court has original jurisdiction that they form part of the same case or controversy.

154.    Defendants engaged in conduct both inside and outside of the U.S. that caused

direct, substantial and reasonably foreseeable anti-competitive effects upon interstate commerce

within the U.S. and upon foreign commerce, giving rise to the claims of E.U. Direct Foreign

Plaintiff and E.U. Direct Foreign Subclass.  The adverse effects of this anti-competitive conduct

41

in the U.S. are interdependent with the adverse effects outside the U.S. and gave rise to the

injuries of the E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass. Defendants could

not have maintained their international price-fixing arrangement for Hard Haberdashery Products

that caused foreign injury to the E.U. Direct Foreign Plaintiff and the members of E.U. Direct

Foreign Subclass without impacting adversely the prices of Hard Haberdashery Products in the

U.S.

155.    The claims in this Complaint for the injuries sustained by the E.U. Direct Foreign

Plaintiff and E.U. Direct Foreign Subclass by reason of Defendants' violations of Article 81 of

the EC Treaty and, in so far as the infringements affected trade between the European

Community and Norway, Iceland, or Liechtenstein, the Defendants' violations of Article 53 of

the EEA Agreement, are brought pursuant to Article 6 of Regulation 1/2003 and 28 U.S.C.

§1367(a) to recover the present value of actual damages sustained by them, including aggravated

and exemplary damages, with appropriate interest, for infringements of E.U. Law.

156.    This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over the E.U.

Law claims asserted in this Count by the E.U. Direct Foreign Plaintiff and E.U. Direct Foreign

Subclass because they arise from the same nucleus of operative facts alleged in this Complaint

and are so related to the Sherman Act claims of the U.S. Direct Purchaser Class, over which this

Court has original jurisdiction, that they form part of the same case or controversy. The E.U.

Law claims asserted in this Count are also supplemental to the Sherman Act claims of the E.U.

Direct Foreign Plaintiff and E.U. Direct Foreign Subclass for the same reason.

157.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the

Clayton Act, 15 U.S.C. §§15 and 22, and 28 U.S.C. §1391(b), (c), and (d), because during the

42

Class Period one or more of the Defendants resided, transacted business, were found, or had

agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred

and a substantial portion of the affected interstate trade and commerce described below has been

carried out in this district.

//

//

### Class Action Allegations

158.    E.U. Direct Foreign Plaintiff brings this action on its own behalf and as a

class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf

of the following Subclass:

> All persons, Undertakings, and other entities outside the
>
> United States (excluding governmental entities, Defendants,
>
> and Defendants' respective predecessors, subsidiaries,
>
> affiliates, and business partners) that purchased Hard
>
> Haberdashery Products directly or indirectly, through
>
> distributors, brokers or resellers, from any of the Defendants
>
> or any predecessor, subsidiary, or affiliate of each, at any
>
> time during the period from January 1, 1977 through
>
> December 31, 2004, for shipment of those products solely
>
> between the U.S. and any European Union Member State.

159.    Because such information is in the exclusive control of Defendants, E.U.

Direct Foreign Plaintiff does not know the exact number of members of the E.U. Direct

43

Foreign Subclass. Due to the nature of the trade and commerce involved, however, E.U. Direct Foreign Plaintiff believes that the members of the E.U. Direct Foreign Subclass number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the world so that joinder of all members of the E.U. Direct Foreign Subclass is impracticable.

160.    There are questions of law or fact common to the E.U. Direct Foreign Subclass which will predominate over any questions that may affect only individual members, including:

a.    whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of Hard Haberdashery Products charged in the United States and throughout the world;

b.    whether Defendants violated Section 1 of the Sherman Act;

c.    whether Defendants violated Article 81 of the EC Treaty;

d.    whether Defendants violated Article 53 of the EEA Agreement;

e.    whether Defendants agreed to and engaged in concerted practices which affected trade between and among E.U. Member States, non-member States, the EFTA/EEA States, and non-EFTA/EEA States, which had as their object or effect the prevention, restriction, or distortion of competition within the common market;

f.    whether Defendants fixed selling prices of Hard Haberdashery Products;

g.    the duration of the conspiracy alleged in this Complaint;

h.    the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

44

        i.       whether the conduct of Defendants, as alleged in this Complaint, caused injury to the businesses or property of E.U. Direct Foreign Plaintiff and the other members of the E.U. Direct Foreign Subclass;

        j.       the effect of Defendants' conspiracy on the prices of Hard Haberdashery Products charged in the United States, the E.U., and throughout the world during the Class Period;

        k.       whether Defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

        l.       whether damages can be shown on a class-wide basis;

        m.       the appropriate measure of damages sustained by E.U. Direct Foreign Plaintiff and other members of the E.U. Direct Foreign Subclass; and

        n.       whether E.U. Direct Foreign Plaintiff and the E.U. Direct Foreign Subclass are entitled to aggravated and exemplary damages.

161.    The E.U. Direct Foreign Plaintiff is a member of the E.U. Direct Foreign Subclass, having directly purchased Hard Haberdashery Products from one or more of the Defendants during the Class Period.

162.    The prosecution of separate actions by individual members of the E.U. Direct Foreign Subclass would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

163.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

        a.       The E.U. Direct Foreign Subclass is readily definable and one for which

45

records should exist in the files of Defendants.

        b.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

        c.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

        d.      Class treatment will permit the adjudication of relatively small claims by many class members on an efficient and manageable basis.

        e.      This class action presents no difficulties of management that would preclude its maintenance as a class action.

    164.    The E.U. Direct Foreign Plaintiff's claims are typical of the claims of other E.U. Direct Foreign Subclass members.

    165.    The E.U. Direct Foreign Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation, and who will fairly and adequately protect the interests of the members of the Foreign Class.

    166.    The E.U. Direct Foreign Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the E.U. Direct Foreign Subclass with respect to the subject matter of this litigation.

<u>**Injury, Loss, and Damage to the E.U. Direct Foreign Plaintiff
and E.U. Direct Foreign Subclass**</u>

<u>**Sherman Act Injury:**</u>

167. The combination and conspiracy alleged herein had the following direct, substantial, and reasonably foreseeable anti-competitive effects, among others, upon commerce in the U.S. and upon foreign commerce:

a.    The prices charged by Defendants to, and paid by, E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass for Hard Haberdashery Products were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b.    E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass have been deprived of free and open competition in the purchase of Hard Haberdashery Products in the United States and worldwide;

c.    E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass were required to pay more for Hard Haberdashery Products than they would have paid in a competitive marketplace absent Defendants' price-fixing scheme; and

d.    Competition in the sale of Hard Haberdashery Products has been restrained, suppressed or eliminated.

168. The conduct alleged herein significantly and adversely affected consumers worldwide, including the E.U. Direct Foreign Plaintiff and the members of the E.U. Direct Foreign Subclass. The adverse effects of Defendants' conduct in the United States and the adverse effects outside the United States were interdependent and inextricably bound.

169. During the Class Period, Defendants' anti-competitive conduct as described herein directly and proximately caused E.U. Direct Foreign Plaintiff and the members of the E.U. Direct Foreign Subclass to pay artificially inflated prices for Hard Haberdashery Products that

47

they would not have paid absent such violations. As a result, E.U. Direct Foreign Plaintiff and the members of the E.U. Direct Foreign Subclass have been injured and damaged in their business and property in an amount to be determined according to proof.

### E.U. Law Loss And Damage:

170.   During the Class Period, the E.U. Direct Foreign Plaintiff and the members of the E.U. Direct Foreign Subclass purchased Hard Haberdashery Products from Defendants solely between the U.S. and any E.U. Member State.

171.   Defendants' agreements and concerted practices, as complained of herein, had the following effects, among others:

      a.   The selling prices of Hard Haberdashery Products were fixed by Defendants at supra-competitive levels; and

      b.   Competition within the common market has been prevented, restricted, or distorted.

172.   If the Hard Haberdashery Products cartel had not been implemented and/or given effect, the E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass would have been able to buy Hard Haberdashery Products at lower prices.

173.   By reason of these breaches, E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass have suffered loss and damage.

### Violations Alleged

### Sherman Act Violation:

174.   During the Class Period, the exact dates being unknown to the E.U. Direct Foreign Plaintiff, Defendants engaged in a continuing agreement, understanding, and

conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the

prices of Hard Haberdashery Products, in the United States and throughout the world

through the means described in this Complaint in violation of Section 1 of the Sherman

Act, 15 U.S.C. §1.

    175.    In formulating and implementing the alleged contract, combination, or conspiracy,

Defendants engaged in anti-competitive activities, the purpose and effect of which were to

artificially raise, fix, maintain, and/or stabilize the prices of Hard Haberdashery Products.

    176.    Defendants' illegal combination and conspiracy alleged herein has had the

following effects, among others:

        a.    price competition in the charging for Hard Haberdashery Products has been

restrained, suppressed, and/or eliminated;

        b.    price competition in customer contracts for the purchase of Hard

Haberdashery Products has been restrained, suppressed, and/or eliminated;

        c.    prices charged by Defendants for Hard Haberdashery Products have been

fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

        d.    prices paid by E.U. Direct Foreign Plaintiff and members of the E.U.

Direct Foreign Subclass have been fixed, raised, maintained, and/or stabilized at artificially high,

non-competitive levels; and

        e.    E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign

Subclass have been deprived of the benefit of free and open competition.

    177.    Defendants' anti-competitive activities and their effects are in violation of the

49

Sherman Act.

178.    During the Class Period, Defendants sold Hard Haberdashery Products in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state and national boundaries. Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anti-competitive effect upon, interstate commerce within the United States and foreign commerce.

179.    Defendants' anti-competitive activities both inside the United States and in foreign nations have caused injury to the E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass.

180.    Defendants' anti-competitive activities and their U.S. effects are interdependent with their foreign effects and have proximately caused injury to the E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass both inside the United States and in foreign nations.

181.    The E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass seek treble damages or the present value of actual damages sustained by them, with appropriate interest, and any such other relief that the Court deems necessary and appropriate.

### E.U. Law Infringements:

182.    During the Class Period, Defendants sold Hard Haberdashery Products and received payment for such sales for shipments of Hard Haberdashery Products between and among E.U. Member States, nonmember States, the EFTA/EEA States, and non-EFTA/EEA States.

50

183.    Defendants agreed to and engaged in concerted practices, which appreciably and foreseeably affected trade between Member States and prejudiced the realization of a market between Member States. These concerted practices had as their object and effect the prevention, restriction and distortion of competition within the common market and were conducted in a manner incompatible with the common market.

184.    Through the agreements and concerted practices complained of herein, Defendants fixed selling prices of Hard Haberdashery Products in breach of Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

185.    Defendants' agreements and concerted practices as complained of herein were not indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, and did not allow consumers a fair share of any resulting benefit.

186.    These agreements and concerted practices introduced the possibility of eliminating competition in respect of Hard Haberdashery Products.

187.    Defendants' wrongful actions were carried out with knowledge of and willful disregard of the rights of the E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass, in a calculating fashion and/or with the expectation of profiting therefrom by exceeding the amounts payable by them to the E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass as a result of such wrongful actions, warranting aggravated and exemplary damages accordingly.

188.    By reason of their implementation of and/or giving effect to the Hard Haberdashery Products cartel, Defendants acted in breach of:

51

a.      a statutory duty imposed under Section 2(1) of the European Communities Act 1972 not to infringe Article 81(1) of the EC Treaty or Article 53(1) of the EEA Agreement; and/or

b.      a statutory duty imposed under Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

189.   Defendants' conduct described herein does not meet the exceptions set forth in Article 81(3) of the EC Treaty.

190.   Defendants' anti-competitive agreements and practices and their foreign effects have caused injury to the E.U. Direct Foreign Plaintiff and members of the E.U. Direct Foreign Subclass, in the E.U. Member States and in the U.S. The E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass seek to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, and any other such relief that the Court deems necessary and appropriate.

## COUNT IV
## VIOLATIONS OF E.U. LAW
## (ON BEHALF OF MIXED U.S.-E.U. FOREIGN PURCHASERS)

191.   The Mixed U.S.-E.U. Foreign Plaintiffs described in this Count incorporate by reference as if fully set forth herein the allegations contained in the paragraphs 1 through 75.

### Mixed U.S.-E.U. Foreign Plaintiffs

192.   Plaintiff Kappler Ltd. is headquartered at Crown Farm Way, NG19 OFT, Mansfield, Nottinghamshire, England. During the Class Period, Kappler, Ltd. (the "Mixed

U.S.-E.U. Foreign Plaintiff") purchased Hard Haberdashery Products directly or indirectly, through distributors, brokers or resellers, from one or more of the Defendants, for shipment of those products between the U.S. and an E.U. Member State, and also for shipment of those products within, to, from, or between an E.U. Member State (excluding shipment of such products to or from the U.S.), and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

193.    During the Class Period, the Mixed U.S.-E.U. Foreign Plaintiff and members of the Mixed U.S.-E.U. Foreign Subclass paid for Hard Haberdashery Products directly to Defendants (or their agents, subsidiaries, and/or controlled affiliates).

## Defendants

194.    Defendants include those parties alleged in paragraphs 16 through 31 of this Complaint.

//

//

//

## Jurisdiction And Venue

195.    This Court has original diversity jurisdiction over all claims brought in this Count pursuant to 28 U.S.C. §1332(d)(2)(B), because the amount in controversy in this action exceeds the sum of $5 million, exclusive of interests and costs, and at least one member of the Class of Plaintiffs is a citizen of a foreign state, and at least one Defendant is a citizen of a State.

196.    The claims in this Complaint for the injuries sustained by the Mixed U.S.- E.U.

53

Foreign Subclass by reason of Defendants' violations of Article 81 of the EC Treaty and, in so

far as the infringements affected trade between the European Community and Norway, Iceland,

or Liechtenstein, Defendants' violations of Article 53 of the EEA Agreement, are brought

pursuant to Article 6 of Regulation 1/2003 and 28 U.S.C. §1367(a) to recover the present value

of actual damages sustained by them, including aggravated and exemplary damages, with

appropriate interest, for infringements of E.U. Law.

197.    This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) over the

E.U. Law claims asserted in this Count by the Mixed U.S.-E.U. Foreign Plaintiff and Mixed

U.S.-E.U. Foreign Subclass because they arise from the same nucleus of operative facts alleged

in this Complaint, and are so related to the Sherman Act claims of the U.S. Direct Purchaser

Class and the E.U. Direct Foreign Subclass over which this Court has original jurisdiction that

they form part of the same case or controversy.

198.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the

Clayton Act, 15 U.S.C. §15, and 28 U.S.C. §1391(b), (c), and (d), because during the Class

Period one or more of the Defendants resided, transacted business, were found, or had agents in

this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a

substantial portion of the affected interstate trade and commerce described below has been

carried out in this district.

### Class Action Allegations

199.    Mixed U.S.-E.U. Foreign Plaintiff brings this action on its own behalf and

as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on

behalf of the following Subclass:

All persons, Undertakings, and other entities outside the

United States (excluding governmental entities, Defendants,

and Defendants' respective predecessors, subsidiaries,

affiliates, and business partners) that purchased Hard

Haberdashery Products directly or indirectly, through

distributors, brokers or resellers, from any of the Defendants

or any predecessor, subsidiary, or affiliate of each, at any

time during the period from January 1, 1977 through

December 31, 2004, for shipment of those products between

the U.S. and any European Union Member State, and also

for shipment of those products within, to, from, or between

any European Union Member State (excluding shipments of

those products to or from the U.S.).

200.    Because such information is in the exclusive control of Defendants, Mixed

U.S.-E.U. Foreign Plaintiff does not know the exact number of members of the Mixed

U.S.-E.U. Foreign Subclass.  Due to the nature of the trade and commerce involved,

however, Mixed U.S.-E.U. Foreign Plaintiff believes that the members of the Mixed

U.S.-E.U. Foreign Subclass number at least in the thousands and are sufficiently

numerous and geographically dispersed throughout the world so that joinder of all

members of the Mixed U.S.-E.U. Foreign Subclass is impracticable.

//

//

201.    There are questions of law or fact common to the Mixed U.S.-E.U. Foreign

Subclass which will predominate over any questions that may affect only individual members,

including:

    a.    whether Defendants violated Article 81 of the EC Treaty;

    b.    whether Defendants violated Article 53 of the EEA Agreement;

    c.    whether Defendants agreed to and engaged in concerted practices which

affected trade between and among E.U. Member States, non-member States, the EFTA/EEA

States, and non-EFTA/EEA States, which had as their object or effect the prevention, restriction,

or distortion of competition within the common market;

    d.    whether Defendants fixed selling prices of Hard Haberdashery Products;

    e.    the duration of the conspiracy alleged in this Complaint;

    f.    the nature and character of the acts performed by Defendants in furtherance

of the conspiracy;

    g.    whether the conduct of Defendants, as alleged in this Complaint, caused

injury to the businesses or property of the Mixed U.S.-E.U. Foreign Plaintiff and Mixed

U.S.-E.U. Foreign Subclass;

    h.    the effect of Defendants' conspiracy on the prices of Hard Haberdashery

Products charged in the E.U. and throughout the world during the Class Period;

    i.    whether damages can be shown on a class-wide basis;

    j.    the appropriate measure of damages sustained by Mixed U.S.-E.U. Foreign

Plaintiff and other members of the Mixed U.S.-E.U. Foreign Subclass; and,

56

k.      whether Mixed U.S.-E.U. Foreign Plaintiff and the Mixed U.S.- E.U.
Foreign Subclass are entitled to aggravated and exemplary damages.

202.    The Mixed U.S.-E.U. Foreign Plaintiff is a member of the Mixed U.S.-E.U.
Foreign Subclass, having directly purchased Hard Haberdashery Products from one or more of
the Defendants.

203.    The prosecution of separate actions by individual members of the Mixed
U.S.-E.U. Foreign Subclass would create a risk of inconsistent or varying adjudications,
establishing incompatible standards of conduct for Defendants.

204.    A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

a.      The Mixed U.S.-E.U. Foreign Subclass is readily definable and one for
which records should exist in the files of Defendants.

b.      Prosecution as a class action will eliminate the possibility of repetitious
litigation.

c.      Treatment as a class action will permit a large number of similarly situated
persons to adjudicate their common claims in a single forum simultaneously, efficiently and
without the duplication of effort and expense that numerous individual actions would engender.

d.      Class treatment will permit the adjudication of relatively small claims by
many class members on an efficient and manageable basis.

e.      This class action presents no difficulties of management that would
preclude its maintenance as a class action.

205.    The Mixed U.S.-E.U. Foreign Plaintiff's claims are typical of the claims of other Mixed U.S.-E.U. Foreign Subclass members.

206.    The Mixed U.S.-E.U. Foreign Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation, and who will fairly and adequately protect the interests of the members of the Foreign Class.

207.    The Mixed U.S.-E.U. Foreign Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Foreign Class with respect to the subject matter of this litigation.

### Loss And Damage To The Mixed U.S.-E.U. Foreign Plaintiff And Mixed U.S.-E.U. Foreign Subclass

208.    During the Class Period, the Mixed U.S.-E.U. Foreign Plaintiff and the members of the Mixed U.S.-E.U. Foreign Subclass purchased Hard Haberdashery Products from Defendants for shipments between the U.S. and any E.U. Member State, and also purchased Hard Haberdashery Products for shipments within, to, from, or between any E.U. Member State (excluding shipments to or from the U.S.).

209.    Defendants' agreements and concerted practices, as complained of herein, had the following effects, among others:

a.    The selling prices of Hard Haberdashery Products were fixed by Defendants at supra-competitive levels; and

b.    Competition within the common market has been prevented, restricted, or distorted.

210.    If the Hard Haberdashery Products cartel had not been implemented and/or given

58

effect, the Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass would have been able to buy Hard Haberdashery Products at lower prices.

211.    By reason of these breaches, Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass have suffered loss and damage.

### Violation Alleged

212.    During the Class Period, Defendants sold Hard Haberdashery Products and received payment for such sales for shipments of Hard Haberdashery Products between and among E.U. Member States, non-member States, the EFTA/EEA States, and non-EFTA/EEA States.

213.    Defendants agreed to and engaged in concerted practices, which appreciably and foreseeably affected trade between Member States and prejudiced the realization of a market between Member States. These concerted practices had as their object and effect the prevention, restriction and distortion of competition within the common market and were conducted in a manner incompatible with the common market.

214.    Through the agreements and concerted practices complained of herein, Defendants fixed selling prices of Hard Haberdashery Products in breach of Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

215.    Defendants' agreements and concerted practices as complained of herein were not indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, and did not allow consumers a fair share of any resulting benefit.

216.    These agreements and concerted practices introduced the possibility of

59

eliminating competition in respect of Hard Haberdashery Products.

217.    Defendants' wrongful actions were carried out with knowledge of and willful disregard of the rights of the Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass, in a calculating fashion and/or with the expectation of profiting therefrom by exceeding the amounts payable by them to the Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass as a result of such wrongful actions, warranting aggravated and exemplary damages accordingly.

218.    By reason of their implementation of and/or giving effect to the Hard Haberdashery Products cartel, Defendants acted in breach of:

a.    a statutory duty imposed under Section 2(1) of the European Communities Act 1972 not to infringe Article 81(1) of the EC Treaty or Article 53(1) of the EEA Agreement; and/or

b.    a statutory duty imposed under Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

219.    Defendants' conduct described herein does not meet the exceptions set forth in Article 81(3) of the EC Treaty.

220.    Defendants' anti-competitive agreements and practices have caused injury to the Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass in the EC Member States and in the U.S.  The Mixed U.S.-E.U. Foreign Plaintiff and Mixed U.S.-E.U. Foreign Subclass seek to recover the present value of actual damages sustained by them, including

aggravated and exemplary damages, with appropriate interest, and any other such relief that the

Court deems necessary and appropriate.

## COUNT V
## VIOLATION OF E.U. LAW
## (ON BEHALF OF E.U. FOREIGN PURCHASERS)

221.    The E.U. Foreign Plaintiffs incorporate by reference as if fully set forth

herein the allegations contained in paragraphs 1 through 75.

### E.U. Foreign Plaintiffs

222.    Plaintiff Kappler Ltd. is headquartered at Crown Farm Way, NG19 OFT,

Mansfield, Nottinghamshire, England.  During the Class Period, Kappler Ltd. (the "E.U.

Foreign Plaintiff") purchased Hard Haberdashery Products directly or indirectly, through

distributors, brokers or resellers, from one or more of Defendants for shipment of those

products within, to, from, or between a European Union Member State (excluding

shipments of those products from or to the U.S.), and has suffered pecuniary injury as a

result of the antitrust violations alleged herein.

223.    During the Class Period, the E.U. Foreign Plaintiff and the E.U. Foreign

Subclass paid for Hard Haberdashery Products directly to Defendants (or their agents,

subsidiaries, and/or controlled affiliates).

### Defendants

224.    Defendants include those parties alleged in paragraphs 16 through 31 of

this Complaint.

//

//

### Jurisdiction And Venue

61

225.    The claims in this Complaint for the injuries sustained by the E.U. Foreign Plaintiff and E.U. Foreign Subclass by reason of Defendants' violations of Article 81 of the EC Treaty and, in so far as the infringements affected trade between the European Community and Norway, Iceland, or Liechtenstein, Defendants' violations of Article 53 of the EEA Agreement, are brought pursuant to Article 6 of Regulation 1/2003 and 28 U.S.C. §1367(a) to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, for infringements of E.U. Law.

226.    This Court has original diversity jurisdiction over all claims brought in this Count pursuant to 28 U.S.C. §1332(d)(2)(B), because the amount in controversy in this action exceeds the sum of $5 million, exclusive of interests and costs, and at least one member of the Class of Plaintiffs is a citizen of a foreign state, and at least one Defendant is a citizen of a State.

227.    This Court also has supplemental jurisdiction under 28 U.S.C. §1367(a) over the E.U. Law claims asserted in this Count by the E.U. Foreign Plaintiff and E.U. Foreign Subclass because they arise from the same nucleus of operative facts alleged in this Complaint and are so related to the Sherman Act claims of the U.S. Foreign and E.U. Direct Purchaser Classes, over which this Court has original jurisdiction, that they form part of the same case or controversy. The E.U. Law claims asserted in this Count are also supplemental to the Sherman Act claims of the E.U. Direct Foreign Plaintiff and E.U. Direct Foreign Subclass.

228.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §15, and 28 U.S.C. §1391(b), (c), and (d), because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in

62

this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

### Class Action Allegations

229.    E.U. Foreign Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Subclass:

> All persons, Undertakings, and other entities (excluding
> governmental entities, Defendants, and Defendants'
> respective predecessors, subsidiaries, affiliates, and
> business partners) that purchased Hard Haberdashery
> Products directly or indirectly, through distributors, brokers or
> resellers, from any of the Defendants or any predecessor,
> subsidiary, or affiliate of each, at any time during the period
> from January 1, 1977 through December 31, 2004, for
> shipment of those products within, to, from, or between any
> European Union Member State (excluding shipments of
> those products to or from the U.S.).

230.    Because such information is in the exclusive control of Defendants, E.U. Foreign Plaintiff does not know the exact number of members of the E.U. Foreign Subclass. Due to the nature of the trade and commerce involved, however, E.U. Foreign Plaintiff believes that the members of the E.U. Foreign Subclass number at

least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all members of the E.U. Foreign Subclass is impracticable.

231.    There are questions of law or fact common to the E.U. Foreign Subclass which will predominate over any questions that may affect only individual members, including:

        a.    whether Defendants violated Article 81 of the EC Treaty;

        b.    whether Defendants violated Article 53 of the EEA Agreement;

        c.    whether Defendants agreed to and engaged in concerted practices, which affected trade between and among E.U. Member States, non-member States, the EFTA/EEA States, and non-EFTA/EEA States, and which had as their object or effect the prevention, restriction, or distortion of competition within the common market;

        d.    whether Defendants fixed selling prices of Hard Haberdashery Products;

        e.    the duration of the conspiracy alleged in this Complaint;

        f.    the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

        g.    the effect of Defendants' conspiracy on the prices of Hard Haberdashery Products charged within the E.U. and throughout the world during the Class Period;

        h.    whether damages can be shown on a class-wide basis;

        i.    the appropriate measure of damages sustained by E.U. Foreign Plaintiff and other members of the E.U. Foreign Subclass; and

        j.    whether E.U. Foreign Plaintiff and the E.U. Foreign Subclass are entitled to aggravated and exemplary damages.

232. The E.U. Foreign Plaintiff is a member of the E.U. Foreign Subclass, having directly purchased Hard Haberdashery Products from one or more of the Defendants.

233. The prosecution of separate actions by individual members of the E.U. Foreign Subclass would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

234. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

a. The E.U. Foreign Subclass is readily definable and one for which records should exist in the files of Defendants.

b. Prosecution as a class action will eliminate the possibility of repetitious litigation.

c. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

d. Class treatment will permit the adjudication of relatively small claims by many class members on an efficient and manageable basis.

e. This class action presents no difficulties of management that would preclude its maintenance as a class action.

235. The E.U. Foreign Plaintiff's claims are typical of the claims of other E.U. Foreign Subclass members.

236. The E.U. Foreign Plaintiff is represented by counsel competent and experienced in

65

the prosecution of antitrust and class action litigation, and who will fairly and adequately protect the interests of the members of the Foreign Class.

237.    The E.U. Foreign Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the E.U. Foreign Subclass with respect to the subject matter of this litigation.

### E.U. Loss And Damage To The E.U. Foreign Plaintiff And E.U. Foreign Subclass

238.    During the Class Period, the E.U. Foreign Plaintiff and the members of the E.U. Foreign Subclass purchased Hard Haberdashery Products from Defendants for shipments within, to, from, or between any E.U. Member State, excluding shipments to or from the U.S.

239.    Defendants' agreements and concerted practices, as complained of herein, had the following effects, among others:

      a.    The selling prices of Hard Haberdashery Products were fixed by Defendants at supra-competitive levels; and

      b.    Competition within the common market has been prevented, restricted, or distorted.

240.    If the Hard Haberdashery Products cartel had not been implemented and/or given effect, the E.U. Foreign Plaintiff and E.U. Foreign Subclass would have been able to buy Hard Haberdashery Products at lower prices.

241.    By reason of these breaches, the E.U. Foreign Plaintiff and E.U. Foreign Subclass have suffered loss and damage.

66

## E.U. Law Infringements Alleged

242.    During the Class Period, Defendants sold Hard Haberdashery Products and received payment for such sales for shipments of Hard Haberdashery Products between and among E.U. Member States, non-member States, the EFTA/EEA States, and non-EFTA/EEA States.

243.    Defendants agreed to and engaged in concerted practices, which appreciably and foreseeably affected trade between Member States and prejudiced the realization of a market between Member States. These concerted practices had as their object and effect the prevention, restriction and distortion of competition within the common market and were conducted in a manner incompatible with the common market.

244.    Through the agreements and concerted practices complained of herein, Defendants fixed selling prices of Hard Haberdashery Products in breach of Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

245.    Defendants' agreements and concerted practices as complained of herein were not indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, and did not allow consumers a fair share of any resulting benefit.

246.    These agreements and concerted practices introduced the possibility of eliminating competition in respect of Hard Haberdashery Products.

247.    Defendants' wrongful actions were carried out with knowledge of and willful disregard of the rights of the E.U. Foreign Plaintiff and E.U. Foreign Subclass, in a calculating

67

fashion and/or with the expectation of profiting therefrom by exceeding the amounts payable by them to the E.U. Foreign Plaintiffs and E.U. Foreign Subclass as a result of such wrongful actions, warranting aggravated and exemplary damages accordingly.

248.    By reason of their implementation of and/or giving effect to the Hard Haberdashery Products cartel, Defendants acted in breach of:

a.    a statutory duty imposed under Section 2(1) of the European Communities Act 1972 not to infringe Article 81(1) of the EC Treaty or Article 53(1) of the EEA Agreement; and/or

b.    a statutory duty imposed under Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement.

249.    Defendants' conduct described herein does not meet the exceptions set forth in Article 81(3) of the EC Treaty.

250.    Defendants' anti-competitive agreements and practices and their foreign effects have caused injury to the E.U. Foreign Plaintiff and E.U. Foreign Subclass in the E.U. Member States and in the U.S. The E.U. Foreign Plaintiff and E.U. Foreign Subclass seek to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, and any other such relief that the Court deems necessary and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

**For All Counts**:

68

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given members of the Classes and Subclasses identified herein;

B.    The Court award all Plaintiffs, Classes, and Subclasses attorneys' fees and costs, and pre-judgment and post-judgment interest, as permitted by U.S. and/or E.U. Law;  and

C.    The Court award Plaintiffs, Classes, and Subclasses such other and further relief as may be deemed necessary and appropriate;

**For Counts I, II, III And IV**:

D.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

E.    Judgment be entered against Defendants, jointly and severally, in favor of Plaintiffs, the Classes, and Subclasses alleged in Counts I, II, III and IV,  for treble damages determined to have been sustained by them by virtue of Defendants' violations of the Sherman Act, as allowed by law;

**For Counts III, IV And V**:

F.    The Court adjudge and decree that the implementation and effect of the cartel alleged herein constitutes a breach of Defendants' statutory duty imposed under Section 2(1) of the European Communities Act 1972 not to infringe Article 81(1) of the EC Treaty or Article 53(1) of the EEA Agreement;

G.    The Court adjudge and decree that the implementation and effect of Defendants'

69

Hard Haberdashery Products cartel alleged herein constitutes a breach of Article 81(1) of the EC Treaty and Article 53(1) of the EEA Agreement;

H.    The Court adjudge and decree Defendants' wrongful acts complained of herein were done intentionally, purposefully, willfully and were carried out in the knowledge of and willful disregard of the rights of Plaintiffs and the Classes they represent, in a calculating fashion

and/or with the expectation of profiting therefrom in an amount exceeding the amounts payable by them to Plaintiffs and the Classes as a result of such wrongful actions; and

I.    Judgment be entered against Defendants, and in favor of Plaintiffs and the Classes and Subclasses alleged in Counts III, IV and V, for the present value of actual damages determined to have been sustained by them by virtue of Defendants' infringements of E.U. Law, and for aggravated and exemplary damages, with appropriate interest, as allowed by law.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  March 4, 2008

Respectfully submitted,

By: _____

Robert G. Eisler (RE-1398)
Seth R. Gassman (SG-8116)
COHEN, MILSTEIN, HAUSFELD
   & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022
Phone: 212-838-7797

70

Fax: 212-838-7745
Email: reisler@cmht.com

Paul F. Bennett
Steven O. Sidener
Joseph M. Barton
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: pfb@gbcslaw.com
Email: sos@gbcslaw.com
Email: jmb@gbcslaw.com

Attorneys for Plaintiffs Kappler, Inc.;
Kappler Canada; Kappler Ltd. And All
Others Similarly Situated

#118730

71